**[J-31-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| GARY L. GREGG AND MARY E. GREGG, | : | No. 29 WAP 2019 |
| | : | |
| Appellees | : | Appeal from the Order of the |
| | : | Superior Court entered September |
| | : | 12, 2018 at No. 1504 WDA 2017, |
| v. | : | affirming the Judgment of the Court |
| | : | of Common Pleas of Allegheny |
| | : | County entered September 27, 2017 |
| AMERIPRISE FINANCIAL, INC., | : | at No. GD 01-006611. |
| AMERIPRISE FINANCIAL SERVICES, | : | |
| INC., RIVERSOURCE LIFE INSURANCE | : | ARGUED:  May 21, 2020 |
| COMPANY AND ROBERT A. KOVALCHIK, | : | |
| | : | |
| Appellants | : | |

**OPINION**

**JUSTICE WECHT**                    **DECIDED:  FEBRUARY 17, 2021**

In 1999, Gary and Mary Gregg sought the expertise of Robert A. Kovalchik, a

financial advisor and insurance salesperson for Ameriprise Financial, Inc.  Engaging in

what the trial court would later conclude to be deceptive sales practices, Kovalchik made

material misrepresentations to the Greggs to induce them to buy certain insurance

policies.  The Greggs ultimately sued Ameriprise Financial, Inc., Ameriprise Financial

Services, Inc., Riversource Life Ins. Co., and Kovalchik (collectively, Ameriprise) under

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. §

201-2(4)(xxi).[1]  The Greggs' complaint also asserted, *inter alia*, common law claims for negligent misrepresentation and fraudulent misrepresentation.

The case proceeded to a jury trial on the common law claims, resulting in a defense verdict.  The CPL claim proceeded to a bench trial.  After the trial court ruled in favor of the Greggs on that CPL claim, Ameriprise filed a motion for post-trial relief arguing (among other points) that the Greggs failed to establish that Kovalchik's misrepresentations were, at the very least, negligent, a finding that Ameriprise asserted was required to establish deceptive conduct under the CPL.

The trial court denied relief, and the Superior Court affirmed.  Like the trial court, the Superior Court concluded that the Greggs were not required to prevail on the common law claims of fraudulent misrepresentation or negligent misrepresentation in order to succeed on their CPL claim.  *Gregg v. Ameriprise Fin.,* 195 A.3d 930, 936 (Pa. Super. 2018).  Applying *Commonwealth v. TAP Pharm. Products, Inc.,* 36 A.3d 1197 (Pa. Cmwlth. 2011), *rev'd on other grounds*, 94 A.3d 350 (Pa. 2014), the Superior Court held that the test for deceptive conduct under the CPL is whether the conduct has the tendency or capacity to deceive, without regard to the actor's state of mind.  *Gregg*, 195 A.3d at 939.

On appeal, this Court is tasked with determining whether, as the Superior Court held, a strict liability standard applies to the Greggs' CPL claim.  A plain language analysis of the relevant statutory provision leads inexorably to the conclusion that deceptive conduct under the CPL is not dependent in any respect upon proof of the actor's state of mind.  The Superior Court's holding is consistent not only with the plain language of the CPL, but also with our precedent holding that the CPL is a remedial statute that should

---

[1]     This section, known as the "catch-all" provision, prohibits anyone who advertises, sells, or distributes good or services from "[e]ngaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding" during a transaction.  73 P.S. § 201-2(4)(xxi).

be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices. *See Commonwealth by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 817 (Pa. 1974). Accordingly, we affirm.

In 1999, Kovalchik held himself out as someone having skill, training, and expertise in insurance and investment products and solicited the Greggs to become his customers. Meeting with his new clients, Kovalchik offered a review of the Greggs' financial worth, investment goals, and insurance products. Kovalchik encouraged the Greggs to rely upon his advice and counsel, and to trust him to achieve their financial goals. This included delegating investment decisions to Kovalchik. In the course of consulting with Kovalchik, the Greggs revealed that they owned seven Prudential Life Insurance policies with a combined value of $121,000. Kovalchik advised the Greggs to liquidate these policies and place the assets into IDS Life Insurance, a corporation that Riversource Life Insurance later acquired.

Kovalchik advised the Greggs to purchase a new Flexible Premium Variable Life Insurance Policy (the "Policy") for Mr. Gregg with a spousal rider for Mrs. Gregg. In addition, Kovalchik persuaded the Greggs to surrender their existing IRA accounts and use those funds to purchase new IRAs through IDS. Finally, Kovalchik advised the Greggs that if they also gave him $300 every month, that money would increase the savings portion of the Policy. Kovalchik's sales pitch led the Greggs to believe that, if the Greggs purchased the new Policy and made annual payments, the Policy would accrue significant cash value that they could use to fund their retirement.

The Greggs followed Kovalchik's advice. The Greggs purchased the Policy; rolled over their existing IRAs into new IRAs with IDS; surrendered the proceeds of their seven Prudential Life Insurance policies; provided Kovalchik with a check for $300; and authorized an automatic monthly withdrawal of $300 from their checking account to cover

the savings portion of the Policy. Accordingly, Prudential sent several checks to IDS from the liquidated insurance policies.

Unbeknownst to the Greggs, Kovalchik divided their $300 payment between the Policy and two IRAs. When Prudential sent a check for $11,601.34 to the Greggs, Kovalchik promised to deposit approximately $9,500 from this check into the Policy. Instead, Kovalchik put $1,700 into each of the new IRAs. Kovalchik put the balance of these proceeds into a new AXP Growth Fund account that he opened for the Greggs. Despite his assertions, Kovalchik did not place any of the $9,500 into the Policy. Each IRA transaction increased Kovalchik's commission via a surcharge of 5.75%. Further, upon Kovalchik's advice, the Greggs declined to enroll Mrs. Gregg in an Air Force benefits plan that would have paid military benefits to Mrs. Gregg if Mr. Gregg died. The Greggs also began sending Kovalchik an additional monthly check, which they believed was going toward the Policy. Instead, Kovalchik placed these funds into the AXP Growth Fund, again increasing Kovalchik's commissions with a surcharge of 5.75%.

In January 2001, the Greggs received a class-action notice that led them to believe that the insurance companies had broken the law. The Greggs sued Ameriprise, Kovalchik, and IDS Life Insurance Company, asserting causes of action for negligent misrepresentation, fraudulent misrepresentation, violation of the catch-all provision of the CPL, breach of fiduciary duty, and negligent supervision. All claims related to the Greggs' purchase of the Policy. The Greggs alleged that Kovalchik misrepresented that the initial lump-sum payment and a one-time payment of $300 would fund the Policy for its term, and that the Policy would accrue significant cash value based upon an initial payment and annual payments thereafter.

In response to Ameriprise's motion for summary judgment, the trial court dismissed the Greggs' negligent supervision claim. On September 16, 2014, the case proceeded

to a jury trial on the Greggs' common law claims for breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation. Following trial, the trial court granted Ameriprise's motion for directed verdict on the breach of fiduciary duty claim. The jury returned a verdict in favor of Ameriprise on the claims for fraudulent and negligent misrepresentation.

The CPL count, as the sole remaining claim, was submitted to the trial court based upon the evidence that had been introduced during the jury trial. Ameriprise argued that the jury verdict in its favor on the common law negligent misrepresentation claim barred a verdict in the Greggs' favor on the statutory claim under principles of *res judicata* and collateral estoppel. The trial court disagreed. On December 17, 2014, the trial court entered a verdict in the Greggs' favor for $52,431.29, which represented the premium the Greggs had paid to the insurance companies plus interest, with a deduction for the amount the insurance companies had already paid to the Greggs in September 2012. On January 6, 2015, the Court granted the Greggs' request for attorneys' fees and costs under the CPL.

Ameriprise appealed, raising two issues, only one of which remains relevant at this juncture.[2] Ameriprise argued that the jury's verdict on the common law misrepresentation claims required the trial court to dismiss the Greggs' CPL claim in accord with the doctrines of *res judicata* and collateral estoppel.

In an opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court explained that there was no state of mind required to sustain a private cause of action under the catch-all provision of the CPL. The trial court distinguished the absence of a state of mind requirement under the CPL from the common law claims of fraudulent or negligent

---

[2] Ameriprise's second issue concerned the amount of damages, and was premised upon Ameriprise's argument that the trial court had failed to account for the value of the insurance coverage Ameriprise had provided to the Greggs from 1999-2012.

misrepresentation, which required proof of intent to deceive or negligence, respectively. *See TAP Pharm. Products, Inc.*, 36 A.3d at 1255 (holding that a jury's defense verdict on common law claims for fraudulent and negligent misrepresentation did not bar a public CPL enforcement action). Applying *TAP*, the trial court held that "the test for deceptive conduct under the [CPL] is 'essentially whether the conduct has the tendency or capacity to deceive, which is a lesser, more relaxed standard than that for fraud or negligent misrepresentation.'" Tr. Ct. Op. at 3 (quoting *TAP*, 36 A.3d at 1253).

According to the trial court, the evidence demonstrated that Ameriprise's conduct created a likelihood of confusion or misunderstanding in the Greggs' dealings with Ameriprise. Even if Kovalchik did not directly misrepresent the cost of the Policy to the Greggs, the trial court found, Kovalchik failed to explain clearly and fully the cost and terms of the Policy. Kovalchik's explanations left the Greggs with the reasonable belief that they would not have to pay any additional money to fund the Policy once their existing policies were transferred to Ameriprise. The trial court additionally noted that the Greggs relied upon Ameriprise to their financial detriment when they elected to forego the purchase of the survivor benefit option for Mr. Gregg's military pension and instead cashed in their whole life policies to purchase the variable life insurance policy recommended by Kovalchik. Crediting the Greggs' testimony, the trial court found that they had proved all elements of a CPL claim by a preponderance of the evidence.

On appeal to the Superior Court, Ameriprise again argued that the defense verdict on the common law claims of fraudulent and negligent misrepresentation precluded liability under the CPL by application of *res judicata* and collateral estoppel principles. *Gregg*, 195 A.3d at 935. According to Ameriprise, the Greggs were required to establish, at a minimum, negligent misrepresentation in order to establish liability under the catch-all provision of the CPL.

Like the trial court, the Superior Court rejected this argument. The Superior Court held that the Greggs could prevail on their CPL claim without proof of Ameriprise's state of mind. The Superior Court reasoned that, by "eliminating the common law state of mind element (either negligence or intent to deceive)," *id.* at 940 (quoting *TAP*, 36 A.3d at 1253), the General Assembly "imposed strict liability on vendors who deceive consumers by creating a likelihood of confusion or misunderstanding in private, as well as public, causes of action." *Id.* Neither carelessness nor intent, which is required for negligent or fraudulent misrepresentation claims, respectively, are required for claims under the catch-all provision of the CPL. *Id.* Rather, what the statute requires is, according to the Superior Court, a likelihood of confusion or misunderstanding by the consumer. *Id.* at 939.

Ameriprise sought allowance of appeal in this Court. We granted review to determine:

> Whether the Superior Court improperly held that a strict liability standard applies to a claim under the "catch-all" provision of the [CPL] as amended in 1996, even though the provision expressly requires proof of "fraudulent or deceptive conduct."

*Gregg v. Ameriprise Fin., Inc.*, 216 A.3d 222 (Pa. 2019). This question involves statutory interpretation, and therefore presents a question of law. *Meyer v. Comty. Coll. of Beaver Co.*, 93 A.3d 806, 813 (Pa. 2014). Our scope of review is plenary, and our standard of review is de novo. *Id.*

Ameriprise argues that "deceptive conduct" as used in the catch-all provision is the act of intentionally giving a false impression or recklessly making a false representation with the intent that the other person should rely on it. Relying on various dictionary definitions of "deceit" and "deception," Ameriprise argues that the Court should construe "deceptive" in the catch-all provision to depend upon the actor's intent to mislead.

Ameriprise further argues that the CPL was enacted as a fraud prevention statute. Consistent with the legislature's intent to eradicate fraud, Ameriprise urges a reading of

the catch-all provision in which the terms "fraudulent" and "deceptive" are synonymous. Consistent with this interpretation, Ameriprise argues that the Greggs were required to prove more than mere confusion or misunderstanding. Examining the legislative history of the CPL, Ameriprise asserts that the catch-all provision was amended in 1996 to encompass "deceptive conduct" in order to combat telemarketing schemes, not to impose strict liability on vendors of goods and services. Had the General Assembly intended to create a strict liability offense, Ameriprise believes, it would have done so by including language imposing strict liability.

Finally, Ameriprise argues that the Superior Court should not have relied upon *TAP* because *TAP* involved a public enforcement action under the CPL, and is therefore inapplicable to private causes of action. Ameriprise believes that this distinction is important because, in a public action, the Attorney General is not required to prove that the consumer relied upon the fraudulent or deceptive conduct or that the statements caused actual harm. In a private action, however, this Court has held that reliance and causation are required. *See Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 202-03 (Pa. 2007).

In support of Ameriprise, *amici curiae* Pennsylvania Coalition for Civil Justice Reform, Pennsylvania Bankers Association, Pennsylvania Health Care Association, Pennsylvania Manufacturers' Association, UPMC, American Property Casualty Insurance Association, American Tort Reform Association, Chamber of Commerce, and National Federation of Independent Business argue that the Superior Court's conclusion is wrong as a matter of law. *Amici* question why, if the legislature intended to transform the catch-all provision from one requiring proof of fraudulent intent to one of strict liability, it did not do so expressly. *Amici curiae* Pennsylvania Association of Realtors and Pennsylvania Builders Association advance the same argument, and assert that applying a strict liability

standard under the catch-all provision will subject millions of consumer transactions to new liability and will open the floodgates of litigation.

In opposition, the Greggs argue that the term "deceptive" in the consumer protection context has taken on a distinct meaning, and is a broader, more flexible standard of actionable misconduct than the traditional tort of common law fraud. In particular, the Greggs note that the CPL describes a wide range of "unfair" and "deceptive" conduct, but references "fraudulent" acts only in the catch-all provision. The Greggs believe that this reflects legislative intent to prohibit a wider range of conduct than what the common law encompassed.

According to the Greggs, federal courts have held that misrepresentation that has the tendency or capacity to mislead consumers is a deceptive act. To consider whether the representation is deceptive, courts will consider the impression created by the representation. The Greggs see no requirement of intent under the catch-all provision. Finally, the Greggs observe that this Court has recently endorsed a broad interpretation of the catch-all provision, holding that "deceptive conduct" includes an act or practice that "has the capacity or tendency to deceive," without regard to the actor's intent to deceive or actual deception. *Commonwealth by Shapiro v. Golden Gate National Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018).

The Pennsylvania Association of Justice ("PAJ"), arguing as *amicus curiae* in support of the Greggs, maintains that the assertions of Ameriprise's *amici curiae* are not consistent with legislative requirements for private causes of action under the CPL. Specifically, PAJ notes that liability under the catch-all provision also requires that the conduct created a likelihood of confusion or misunderstanding. A subjective assertion will not suffice. Also filing an *amicus curiae* brief in support of the Greggs, the Commonwealth of Pennsylvania argues that, as previously determined by the Superior

and Commonwealth Courts, the 1996 amendment establishes a strict liability standard for fraudulent and deceptive conduct.[3]

The National Consumer Law Center, National Association of Consumer Advocates, Community Legal Services, and others have also filed an *amicus curiae* brief in support of the Greggs. These *amici* note that, of the twenty enumerated provisions of the CPL that precede the catch-all provision, some include an intent requirement, while some do not. That the legislature premised liability in the catch-all provision on "any other" such conduct indicates that the legislature did not intend to require intent. Moreover, these *amici* argue, the history of the CPL indicates that it was intended to add additional consumer protections beyond what the common law provided. Consumer protections are understood as strict liability provisions under federal law, as well as under the laws of many states. These states, as well as the federal government, understand that where a transaction is deceptive, a business has no right to keep the consumer's money.

Prior to the adoption of the CPL, individual consumers who had been victimized in the marketplace by unscrupulous vendors could vindicate their rights only under the common law theories of negligent and fraudulent misrepresentation. Fraudulent (or intentional) misrepresentation requires the plaintiff to prove six elements: (1) a representation; (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or reckless disregard as to whether it is true or false; (4) with the intent to mislead another person into relying on it; (5) justifiable reliance; and (6) an injury proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999). The four elements of a common law claim for negligent misrepresentation are: (1) a

---

[3]     *See* Brief for the Cmmw. of Pa. as *Amicus Curiae* Supporting Appellees (citing *Bennett v AT Masterpiece*, 40 A.3d 145 (Pa. Super. 2012); and *Commonwealth v. Percudani*, 825 A.2d 743 (Pa. Cmwlth. 2003)).

misrepresentation of a material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation. *Id.* at 561. In contrast with intentional misrepresentation, a negligent "misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Id.*

Against this common law backdrop, and drawing upon the model of consumer protection statutes drafted by the Uniform State Law Commissions and the Federal Trade Commission, Pennsylvania's General Assembly passed the CPL in 1968.[4] The intent of the General Assembly was "to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices." *Monumental,* 329 A.2d at 815. To this end, the CPL recognized "the unequal bargaining power of opposing forces in the marketplace" and "attempt[ed] to place on more equal terms seller and consumer." *Id.* at 816. This Court has stated emphatically that, as a remedial statute, the CPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices." *Id.* at 817.

Section 201-9.2 creates a causation element, which requires a private plaintiff to demonstrate justifiable reliance. *See Schwartz v. Rockey*, 932 A.2d 885, 897 n.16 (Pa. 2007) (noting that "the justifiable reliance criterion derives from the causation requirement" of Section 201-9.2). Regardless of which unfair method of competition a plaintiff challenges in a private cause of action, therefore, Section 201-9.2 requires the plaintiff to establish justifiable reliance. Creating both public and private causes of action,

---

[4]     *See* Stephen Buckingham, *Distinguishing Deception and Fraud: Expanding the Scope of Statutory Remedies Available in Pennsylvania for Violations of State Consumer Protection Law*, 78 TEMP. L. REV. 1025, 1028 (2005); Charlotte E. Thomas, *The Quicksand of Private Actions Under the Pennsylvania Unfair Trade Practices Act: Strict Liability, Treble Damages, and Six Years to Sue*, 102 DICK. L. REV. 1, 2 (1997).

the legislature established a statutory claim for anyone who demonstrates that: (1) they purchased or leased "goods or services primarily for a personal, family, or household purpose"; (2) they suffered an "ascertainable loss of money or property"; (3) the loss occurred "as a result of the use or employment by a vendor of a method, act, or practice declared unlawful by" the CPL; and (4) the consumer justifiably relied upon the unfair or deceptive business practice when making the purchasing decision. 73 P.S. § 201-9.2(a); *Id.*, § 201-8; *see also Schwartz*, 932 A.2d 897 n.16.

While Section 201-2(4) enumerates twenty distinct unfair methods of competition and unfair or deceptive acts and practices that are unlawful, the legislature also included the catch-all provision in Section 201-2(4)(xxi). Prior to its amendment in 1996, the catch-all provision made it unlawful to engage in "any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." *Id* § 201-2(4)(xvii) (1968) (amended 1996). Pennsylvania courts interpreted this provision as requiring proof of common law fraud. *See, e.g.*, *Hammer v. Nikol*, 659 A.2d 617, 619 (Pa. Cmwlth. 1995) ("To be actionable under the catchall provision, however, the 'confusion or misunderstanding' created must be fraudulent."); *Prime Meats, Inc. v. Yochim*, 619 A.2d 769, 773 (Pa. Super. 1993) (requiring the plaintiff to prove elements of common law fraud to recover under the CPL's catch-all provision because that section forbade only fraudulent conduct). Common law fraud was dependent upon proof of the actor's state of mind, requiring proof that the actor acted intentionally. *Bortz*, 729 A.2d at 561.

Apparently dissatisfied with this restrictive interpretation, in 1996, the General Assembly expanded the unlawful conduct barred by the catch-all provision so as also to prohibit deceptive conduct. The resulting iteration bars "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi) (1996). While the pre-amendment language had been interpreted as

barring only common law fraud, the amended language expanded liability by barring any deceptive conduct that creates a likelihood of confusion or of misunderstanding. It is this amended language that the Court is called upon to interpret today.

With this background in mind, we confront the plain language of the catch-all provision to determine whether, as the Superior Court held, a strict liability standard applies to the Greggs' CPL claim. When this Court interprets legislative enactments, we are mindful that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "The best indication of legislative intent is the plain language of the statute." *Kistler v. Commonwealth, State Ethics Comm'n*, 22 A.3d 223, 227 (Pa. 2011). "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." *Chanceford Aviation v. Chanceford Twp. Bd. of Supervisors*, 923 A.2d 1099, 1104 (Pa. 2007) (quotations omitted). "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S. § 1903(a). As the CPL is a remedial statute, we must construe it liberally. *Monumental*, 329 A.2d at 815-16.

The addition of "deceptive" to describe the type of conduct barred by the catch-all provision of the CPL expanded that provision beyond fraudulent conduct. In particular, in the context of consumer protection, "deceptive conduct" had acquired a peculiar and appropriate meaning prior to the 1996 amendment. As we have explained, the CPL is based upon the Federal Trade Commission Act ("FTCA") and the Lanham Act. *Id.* at 818 (observing that parts of the CPL are identical to the FTCA and that the "Lanham Act's similarity to the [CPL] is likewise strong"). Under the FTCA, deception is a broader

concept of misconduct than common law fraud, and requires no proof of the actor's state of mind. *See, e.g.*, *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 670 (7th Cir. 1967) (rejecting the argument that deceptive advertising required proof of intent: "whatever Wards' intentions were in the advertising, they are not controlling in the determination of its deceptiveness"). Rather than being premised upon intent, misrepresentation that has the tendency or capacity to deceive is a deceptive act under federal law. *Id.* ("Actual deception, proved by deceived consumers, is not necessary: the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged."); *see also Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) (explaining that a deceptive representation depends upon the impression created by the representation, rather than its truth or falsity).

In *FTC v. Algoma Lumber Co.*, 291 U.S. 67 (1934), the Supreme Court of the United States defined deceptive conduct in the context of consumer protection as conduct that has the "capacity to deceive." *Id.* at 81. Our General Assembly assumedly was aware of the High Court's longstanding expansive definition when it chose the same language in 1996. As prescribed in the 1996 amendment to the CPL, therefore, deceptive conduct as it pertains to consumer protection plainly has the same meaning that the Supreme Court embraced in *Algoma Lumber*. It is the capacity to deceive rather than the actor's state of mind that renders conduct actionable under the amended catch-all provision of the CPL.

Indeed, this Court recently applied this well-established definition of deceptive conduct to the CPL's catch-all provision without regard to the actor's state of mind. In *Golden Gate*, the Court recognized the remedial purposes of the CPL and held that "[a]n act or a practice is deceptive or unfair if it has the capacity or tendency to deceive, and neither the intention to deceive nor actual deception must be proved; rather, it need only

be shown that the acts and practices are capable of being interpreted in a misleading way." 194 A.3d at 1023 (cleaned up).

*Golden Gate* answers the question before us today. And its plain language interpretation is consistent with cases from the intermediate appellate courts in the years since the 1996 amendment. The Superior Court initially continued to interpret Section 201-2(4)(xxi) to require proof of common law fraud without regard to the effect of the 1996 amendment. *See, e.g., Ross v. Foremost Ins. Co.,* 998 A.2d 648, 654 (Pa. Super. 2010) (holding that the catch-all provision required proof of common law fraud); *Skurnowicz v. Lucci*, 798 A.2d 788 (Pa. Super. 2002); *Booze v. Allstate Ins. Co.,* 750 A.2d 877 (Pa. Super. 2000); *Fay v. Erie Ins. Group*, 723 A.2d 712 (Pa. Super. 1999); *Sewak v. Lockhart*, 699 A.2d 755 (Pa. Super. 1997); *DiLucido v. Terminix Int'l, Inc.,* 676 A.2d 1237 (Pa. Super. 1996). The Superior Court in these cases did not discuss the 1996 amendment, but continued to apply its pre-existing precedent without regard for the statutory change.

At the same time, several decisions from the federal courts in the Eastern District of Pennsylvania rejected the Superior Court's disregard for the statutory change. *See Flores v. Shapiro & Kreisman*, 246 F.Supp.2d 427 (E.D. Pa. 2002) (noting that maintaining the pre-1996 pleading requirements would render the words "or deceptive conduct" redundant and superfluous); *Patterson v. Chrysler Fin. Co.*, 263 B.R. 82, 92 n. 17 (Bankr. E.D. Pa. 2001) (discussing how another court's failure to analyze the impact of the 1996 amendment to the CPL on the requirement that a plaintiff show all of the elements of common law fraud to prevail in a CPL action); *Rodriguez v. Mellon Bank, N.A.,* 218 B.R. 764, 784 (Bankr. E.D. Pa.1998) (noting that the addition of "or deceptive conduct" signals an approval of a less restrictive interpretation of the CPL).

The Commonwealth Court addressed the 1996 amendment in *Commonwealth v. Percudani*, 825 A.2d 743 (Pa. Cmwlth. 2003), and diverged from the Superior Court.

Based upon the language of the 1996 amendment, this Court's instruction to construe the CPL liberally, and the Superior Court's failure to provide any rational basis for its continuing restrictive view of the catch-all provision, the Commonwealth Court adopted the position of the Bankruptcy Court. *Id.* at 747.

The Superior Court eventually became aware that its precedent did not account for the amended language. In *Bennet v. A.T. Masterpiece*, 40 A.3d 145, 154 (Pa. Super. 2012), the Superior Court aligned itself with the Commonwealth Court in recognizing that "the legislature's inclusion of 'deceptive' in 1996 signaled that either fraudulent or deceptive conduct would constitute a catchall violation." *Id.* at 154.

In *TAP*, the Commonwealth Court found no inconsistency between a jury's defense verdict on claims of negligent or fraudulent misrepresentation and a trial court's decision that the defendant violated the catch-all provision of the CPL. 36 A.3d at 1253. Interpreting the catch-all provision, the Commonwealth Court held that the test for deceptive conduct is "whether the conduct has the tendency or capacity to deceive." *Id.* We agree. This test is, as the Commonwealth Court has recognized, a lesser, more relaxed standard than that for fraudulent or negligent misrepresentation. *See id.* As the Commonwealth Court concluded, all that the statute requires the plaintiff to prove is that "the acts or practices are capable of being interpreted in a misleading way." *Id.*

Courts in states that employ language similar to that of our CPL have also held that proof of intent is not necessary in order to establish deceptive conduct. *See, e.g.*, *State of Alaska v. O'Neill Investigations, Inc.,* 609 P.2d 520, 535 (Alaska 1980); *Regency Nissan, Inc. v. Taylor*, 391 S.E.2d 467, 470 (Ga. Ct. App. 1990); *State ex rel. Kidwell v. Master Distribs, Inc.*, 615 P.2d 116, 122 (Idaho 1980); *Kowalski v. Cedars of Portsmouth Condo. Ass'n*, 769 A.2d 344, 349 (N.H. 2001); *see also* Buckingham, *supra* note 2, at 1034 n.103.

It is noteworthy as well that Black's Law Dictionary defines "deceptive act" as follows: "As defined by the Federal Trade Commission and most state statutes, conduct that is likely to deceive a consumer acting reasonably under similar circumstances. — Also termed *deceptive practice*; *deceptive sales practice*." *Deceptive Act*, Black's Law Dictionary (11th ed. 2019).

Mindful of our task liberally to construe the CPL in accord with the General Assembly's intent to eradicate unfairness and deception in consumer transactions, *Monumental*, 329 A.2d at 817, we are bound to conclude again that the plain language of the amended provision eliminates the state of mind element that was required prior to the amendment. The plain language of the current statute imposes liability on commercial vendors who engage in conduct that has the potential to deceive and which creates a likelihood of confusion or misunderstanding. That is all that is required. The legislature required neither carelessness nor intent when a cause of action is premised upon deceptive conduct.

Had the General Assembly intended to limit the catch-all provision to cover only common law misrepresentation claims, it would have done so directly by, for example, barring only fraudulent or negligent conduct. By choosing instead to bar "deceptive conduct," the General Assembly signaled its intent to dispense with consideration of the actor's mental state.

Accordingly, under the plain meaning of the statute, deceptive conduct during a consumer transaction that creates a likelihood of confusion or misunderstanding and upon which the consumer relies to his or her financial detriment does not depend upon the actor's state of mind. Liberally construing the CPL as we must, the amended language places the duty of compliance with the CPL on commercial vendors, without regard to their intent. Without a state of mind requirement, the amended catch-all

provision fairly may be characterized as a strict liability offense. As the Superior Court in

this case held:

> [A]ny deceptive conduct, "which creates a likelihood of confusion or of misunderstanding," is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the utmost care (as in strict liability). Whether a vendor's "conduct has the tendency or capacity to deceive . . . is a lesser, more relaxed standard than that for fraud or negligent misrepresentation." *TAP*, 36 A.3d at 1253. The only thing more relaxed than negligence—regarding a consumer's burden of proof—is strict liability.

*Gregg,* 195 A.3d at 939.

Like other strict liability offenses, liability for deceptive conduct under the CPL

cannot be excused if consumers rely upon that conduct to their financial detriment.

Representations made in the consumer context are within the exclusive control of the

vendor:

> [A commercial transaction] occurs in a designed setting entirely of the vendor's own creation via preplanned marketing schemes. Thus, vendors place themselves, by choosing where, when, and how they enter the market, in a much stronger position to comply fully with the [CPL] before soliciting or interacting with consumers. Vendors not only elect whether to enter a market, but, because "the market" is a fictional place, they have full volitional control over their conduct when in it.
>
> The [CPL] is for consumer protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. Like the Greggs, those consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. Therefore, the legislature has placed the duty of [CPL] compliance squarely and solely on vendors; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do.

*Id.* at 939-40. It is the vendor—not the consumer—that is charged with complying with

the CPL, as the vendor is in a better position to determine whether the representation

might be deceptive. Strict liability for such violations is consistent with the legislative

mandate to eradicate the use of unfair and deceptive conduct in consumer transactions. *Monumental*, at 815-16.

The General Assembly knows well how to add a state of mind requirement to a statute. Within the CPL itself, numerous provisions require intent or knowledge before a violation will be found. See, e.g., 73 P.S. § 201-2(4)(ix) (requiring proof of intent not to sell goods and services as advertised); id. § 201-2(4)(x) (requiring proof of intent not to supply public demand); id. § 201-2(4)(xv) (requiring proof that the vendor made knowing misrepresentations). The absence of any reference to the actor's state of mind in the catch-all provision demonstrates that the legislature did not intend to require proof of the actor's state of mind. "[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent." *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009). It is not for the courts to add a state of mind requirement to the statute where the legislature did not choose to do so. *See Commonwealth v. Rieck Inv. Corp.*, 213 A.2d 277, 282 (Pa. 1965) (courts should not add to a statute a requirement that the legislature chose not to include).

Strict liability is not a foreign concept in consumer protection. For example, the Fair Debt Collection Practices Act is generally characterized as "a strict liability statute to the extent it imposes liability without proof of an intentional violation." *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d. Cir. 2011); *see also In re Porter*, 961 F.2d 1066, 1078 (3d Cir. 1992) (recognizing that the Truth in Lending Act "achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made." (quotations omitted)). The Superior Court's characterization of the catch-all provision as creating strict liability makes perfect sense in this context. Under the catch-all provision of the CPL, the actor's state of mind as to either the truth or falsity

of the representation or the effect that the misrepresentation will have on the consumer is irrelevant.

We reject Ameriprise's argument that the catch-all provision means something different depending upon whether it is brought in a public enforcement action or a private action. *Toy* does not support Ameriprise's argument. There, a private purchaser of insurance brought a CPL claim against an insurer under the catch-all provision as it stood prior to its 1996 amendment. Interpreting the pre-1996 version of the catch-all provision, the Court required the plaintiff to demonstrate the common law requirements of justifiable reliance and causation of harm. In doing so, the Court suggested that these requirements derived solely from the common law. As the Court subsequently clarified, however, these elements were statutory, deriving from the CPL itself. *Schwartz*, 932 A.2d at 897, n.16. There is no basis upon which we can glean different requirements from the statute depending upon whether the action is public or private, and *Toy* does not support such an interpretation.

While the learned Dissent recognizes that neither an intention to deceive nor actual deception must be proven, *see Golden Gate*, 194 A.3d at 1023, it nevertheless discerns an open question concerning the state of mind that must be established under Section 201-2(4)(xxi). Dissenting Op. at 7. The Dissent attempts to establish that a demonstration of deceptive conduct under the catch-all provision does not depend upon the vendor's knowledge of the truth or falsity of the statement, but instead upon the "vendor's state of mind with respect to the misleading or confusing *effect* his statements or actions are likely to have on a consumer." *Id.* at 8. For the Dissent, this means that a vendor can act without regard to the truthfulness of the statement, but can be liable only if the vendor is or should be aware that the statement is capable of misleading the consumer. The Dissent considers this to be a negligence standard. *Id.* at 9.

Although the Dissent perceives the absence of an explicit strict liability designation to signal an intent requirement, it is the absence of an intent requirement that imposes a strict liability standard. As explained above, if the General Assembly intended to add a state of mind requirement, it would have done so. The Dissent's vexation with the "strict liability" label notwithstanding, such a label is an apt description of the state of mind, or lack thereof, encompassed within "deceptive conduct." A statute that requires no proof of the actor's state of mind imposes liability without regard to state of mind. Under the catch-all provision of the CPL, the actor's state of mind as to either the truth or falsity of the representation or the effect that the misrepresentation will have on the consumer is irrelevant.

The Dissent also finds it "incongruous" that the legislature would prohibit fraudulent conduct, which requires an intentional state of mind, and then lower the bar to include deceptive acts without regard to the actor's state of mind. Dissenting Op. at 5. We perceive nothing incongruous in the establishment of multiple ways to demonstrate a violation of the catch-all provision, or in a lowering of the bar in order to capture conduct based upon strict liability. Where the statute is silent as to the requisite state of mind, the statute requires neither intent to deceive nor negligence with regard to the effect of the misrepresentation.[5] Further, even if the legislature's policy choice were to strike us as

---

[5] The Dissent faults our plain language analysis of the catch-all provision as failing to give effect to the meaning of fraud, rendering that term surplusage. Dissenting. Op. at 9. But fraud and deceptive conduct are distinct concepts, with their own requirements of proof. And they are alternative ways to establish a violation of the catch-all provision. When the General Assembly chose the amendatory language, it borrowed a term that was well-established in the field of consumer protection, a term that is not dependent in any respect upon intent. *See Commonwealth v. Percudani*, 825 A.2d 743, 747 (Pa. Cmwlth. 2003) (holding that maintaining the pre-1996 pleading requirements would render the words "or deceptive conduct" redundant and superfluous, contrary to the rules of statutory construction).

"incongruous," that would be no concern of ours. Finding the language to be plain, our task is complete.

In ruling in the Greggs' favor, the trial court found that Ameriprise's representations to the Greggs "created a likelihood of confusion or misunderstanding" because Kovalchik "failed to clearly and fully explain the cost and terms of the [life insurance] policy." Tr. Ct. Op., 12/5/2017, at 4. As a result, the Greggs "reasonably believed" that they would not pay any additional money for the new life insurance policy. *Id.* The trial court's finding of liability under the catch-all provision did not depend upon Ameriprise's state of mind. Because the Superior Court was correct in its characterization of the catch-all provision as a strict liability provision, we affirm.

Justices Donohue, Dougherty and Mundy join the opinion.

Justice Todd files a dissenting opinion in which Chief Justice Saylor and Justice Baer join.

---

The Dissent's intent requirement would read into the statute words that are not there. *Rieck Inv. Corp.*, 213 A.2d at 282; *Danganan v. Guardian Protection Services*, 179 A.3d 9, 17 (Pa. 2018) ("the Court may not supply additional terms to, or alter, the language that the Legislature has chosen"). There is simply no indication in the plain language of the catch-all provision that deceptive conduct depends upon intent.